AVENTIS ENVIRONMENTAL SCIENCE USA LP, f/k/a Agrevo Environmental Health, Inc., Plaintiff,

v.

SCOTTS COMPANY, Scotts' Miracle–Gro Products, Inc., OMS Investments, Inc., and Monsanto Company Defendants.

No. 99 Civ. 4015(LAP)(THK).

United States District Court, S.D. New York.

Jan. 13, 2005.

---

See, also, 2004 WL 2389883.

Michael D. Blechman, Michael Braff, Jennifer B. Patterson, Kaye Scholer LLP, New York, NY, for Plaintiff.

David M Morris, Fried, Frank, Harris, Shriver & Jacobson, L.L.P., NYC, NY, Dominic Suprenant, Robert C. Juman, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, New York, NY, Gregory P. Joseph, Fried, Frank, Harris et al., Linda R. Blumkin, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, Alan M. Unger, Sidley Austin Brown & Wood LLP, New York, NY, Charles W. Douglas, Pro Hac Vice Lead Attorney, John W. Treece, Pro Hac Vice Lead Attorney, for Defendant.

*OPINION AND ORDER*

PRESKA, District Judge.

RoundUp—"No Root No Weed No Problem"—has been the dominate non-selective herbicide for many years. This action questions the manner in which RoundUp has retained that dominance: have the defendants in this case acted to drive competitors from the market while depriving the plaintiff the benefit of its bargain, or have defendants simply made sound business decisions that are neither illegal nor violate the letter or spirit of the contracts at issue? Though there is insufficient evidence to support some of plaintiff's claims, genuine issues of material fact remain for a jury to decide. Accordingly, the parties' motions for summary judgment are denied in part and granted in part, and the case shall proceed to trial.

## BACKGROUND

### I. The Facts

#### A. The Parties

Plaintiff Aventis Environmental Science USA LP ("Aventis ES") is a Delaware limited partnership and the alleged successor to the assets and liabilities of the original plaintiff to this action, AgrEvo Environmental Health, Inc. ("AgrEvo EH") and its affiliates. (Defendants' Joint Statement Pursuant to Civil Rule 56.1 of Undisputed Facts Material to Plaintiff's Antitrust Claims ("Def's Antitrust 56.1") ¶ 1; Third Am. Compl. ¶ 3, 8–10.) Aventis ES was acquired by Bayer AG in June 2002 and merged Aventis ES and Aventis ES's parent company, Aventis CropScience SA, into Bayer CropScience.[1]

Defendants Scotts Company and Scotts' Miracle–Gro Products, Inc. are Ohio corpo-

---

1. For the sake of clarity, plaintiff in this action shall be referred to as AgrEvo EH, the original plaintiff, unless a distinction is germane to a particular discussion.

rations with their principal places of business in Marysville, Ohio and Port Washington, New York, respectively. (Def's Antitrust 56.1 ¶¶ 2–3.) Defendant OMS Investments, Inc. is a Delaware corporations (Def's Antitrust 56.1 ¶ 4.) Scotts Company, Scotts' Miracle–Gro Products, Inc. and OMS Investments, Inc. are herein collectively referred to as "Scotts". Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

## B. The Finale Agreement

In 1994, AgrEvo EH developed a non-selective herbicide ("NSH"), glufosinate ammonium ("GA"), which it marketed and sold to consumers under the trade name "Finale." (Def's Antitrust 56.1 ¶ 4; Plaintiff's Amended Counter Statement of Disputed Material Facts in Opposition to Defendants' Motions for Summary Judgment ("Pl's Antitrust Opp. 56.1") ¶ 10.) On May 15, 1998, AgrEvo EH, entered into an Asset Sales Agreement (the "ASA") with Scotts' Miracle–Gro Inc. and OMS Investments, Inc. that sold to Scotts "certain rights, title and interest" in AgrEvo EH products, including Finale, which were part of AgrEvo EH's Home and Garden Consumer Products Business.[2] (ASA p. 1–2.) Enumerated product registrations, title to trademark registrations and applications, customer lists, and other assets were also sold. (ASA p. 1–2.)

In conjunction with the ASA, AgrEvo EH and Scotts entered into an Exclusive GA Supply Agreement (the "GA Supply Agreement" or "GASA") whereby AgrEvo EH would manufacture and supply Scotts' requirements of GA, the active ingredient in Finale. (GASA p. 1.) The GA Supply Agreement contained a "Take or Pay Obligation" that required Scotts either to pur-

chase $12.6 million of GA during the first three years of the GA Supply Agreement or to pay 50% of the difference between the $12.6 minimum purchase commitment and the amount of actual GA purchased. (GASA § 2.3.) Scotts' maximum obligation to AgrEvo EH pursuant to the this provision (the "take-or-pay provision"), the amount Scotts would owe if Scotts purchased no GA from AgrEvo EH, was thus $6.3 million. (Def's Antitrust 56.1 ¶¶ 41–42.)

In conjunction with the ASA, Scotts and AgrEvo EH also entered into a Non–Exclusive Insecticide Supply Agreement (the "Insecticide Supply Agreement" or "ISA"). The Insecticide Supply Agreement set forth the terms by which Scotts would become the non-exclusive distributor of AgrEvo EH's insecticide products and AgrEvo EH would supply all of Scotts' requirements for the various insecticides.

## C. The Roundup Agreement

Monsanto developed a proprietary NSH, glyphosate, in 1984, and Monsanto began manufacturing and marketing glyphosate to consumers under the name RoundUp. (Def's Antitrust 56.1 ¶ 9; Pl's Antitrust Opp. 56.1 ¶ 9.) Since Monsanto's introduction of the product, RoundUp has been very successful, indeed the best-selling residential NSH in the United States. Though much of this case depends on the characterization of Monsanto's actions and motivations in deciding to sell some or all of its interest in RoundUp, Monsanto contends that in late 1997 it decided to concentrate on the "life sciences" business and began looking to sell its consumer lawn and garden division, called Solaris, which included RoundUp. (Def's Antitrust 56.1 ¶ 12.) Scotts initially indicated to Monsan-

---

**2.** AgrEvo EH contends that Scotts planned to relaunch Finale under the brand name "Fi-

nal!." Unless relevant, all references within this Order shall be to Finale.

to that it was interested in the RoundUp business, but in early 1998 Monsanto entered into exclusive negotiations with another company for the sale of Solaris. (Def's Antitrust 56.1 ¶ 19.)

Monsanto's exclusive negotiations, however, collapsed, and in April 1998, potential purchasers of the Solaris division, including Scotts, were again contacted. (Def's Antitrust 56.1 ¶¶ 30–34.) On June 15, 1998, Scotts submitted a bid to purchase the non-RoundUp assets of the Solaris division and to become Monsanto's exclusive agent and marketer of RoundUp in the United States. (Def's Antitrust 56.1 ¶ 52.) Monsanto evaluated the bids it had received, and on June 24, 1998, Monsanto and Scotts signed a letter of intent to enter into an exclusive agency and marketing agreement for the sale of consumer RoundUp, which was then executed on September 30, 1998 (the "RoundUp Agreement"). (Def's Antitrust 56.1 ¶¶ 61–62.)

### D. Scotts Divests the Finale Assets to Farnam

In 1993, Monsanto had entered into a consent decree with the Federal Trade Commission (the "FTC") upon acquiring the Ortho product line from the Chevron Corporation. Under the terms of the consent decree Monsanto agreed not to acquire any direct or indirect interest in any competing NSH until 2003. (Def's Antitrust 56.1 ¶¶ 44–46.) Monsanto asserts that it informed Scotts that under the terms of the consent decree with the FTC, Monsanto believed that it would not be able to enter into the RoundUp Agreement with Scotts until Scotts divested its interest in the Finale assets recently acquired from AgrEvo EH. (Def's Antitrust 56.1 ¶ 47.) Scotts asserts that based on what it was told about the consent decree by Mon-

santo, Scotts began looking to divest the Finale assets. (Def's Antitrust 56.1 ¶ 47.)

Regardless of Scotts' stated reasons for divesting the Finale assets, which AgrEvo EH contends do not reflect Scotts' true motivations (Pl's Antitrust Opp. 56.1 ¶¶ 44–51), Scotts did in fact divest some of its interest in Finale.[3] The parties dispute Scotts' characterization of its offer of the Finale business back to AgrEvo EH and Scotts' efforts to try to find prospective buyers for the Finale assets, but the parties do agree that Scotts did eventually divest at least some of the Finale assets to Farnam Companies, Inc. ("Farnam") on February 15, 1999. (Def's Antitrust 56.1 ¶¶ 66–79; Pl's Antitrust Opp. 56.1 ¶¶ 66–79.) As a result of this divestiture, Farnam became the seller and marketer of Finale (Def's Antitrust 56.1 ¶¶ 83–86), though Scotts retained the take-or-pay obligation and paid almost $6 million in May 2002 pursuant to that provision of the GA Supply Agreement (Def's Antitrust 56.1 ¶¶ 99–102).

### II. Procedural History

AgrEvo EH filed the original complaint in this action on June 3, 1999, which was then amended on August 16, 1999. A second amended complaint was filed by AgrEvo EH on May 17, 2000. Following oral argument, on June 19, 2000, I denied Scotts' and Monsanto's motions to dismiss the second amended complaint, with the exception of my dismissal of AgrEvo EH's claim for tortious interference with contract, which I held did not sufficiently plead an intentional procurement of breach. AgrEvo EH was granted permission by the Honorable Theodore Katz, United States Magistrate Judge, to file the Third Amended Complaint, which was filed on September 7, 2001. On March 31, 2003, I upheld Judge Katz's decision to permit

---

**3.** The scope of Scotts' divestiture is disputed by the parties.

the filing of the Third Amended Complaint. On October 26, 2001, Monsanto filed a motion to dismiss the claims of AgrEvo EH's affiliates for lack of standing, which is converted into a motion for summary judgment and addressed herein.

On May 3, 2004, Scotts and Monsanto filed various motions for summary judgment to dismiss AgrEvo EH's claims in the Third Amended Complaint. Scotts and Monsanto filed joint motions for summary judgment to dismiss AgrEvo EH's antitrust claims for lack of standing and antitrust claims on the merits. Scotts filed a motion for summary judgment to dismiss AgrEvo EH's contract claims, and Monsanto filed a motion for summary judgment to dismiss AgrEvo EH's claim for tortious interference with business relations. Also on May 3, 2004, Monsanto and Scotts filed a joint motion to preclude the expert testimony of AgrEvo EH's damage expert.

On May 3, 2004, AgrEvo EH filed a motion for partial summary judgment on its antitrust claim for liability pursuant to Section 1 of the Sherman Antitrust Act. AgrEvo EH also filed a motion to preclude the expert testimony of four of defendants' experts on various grounds.

Oral argument on the motions was held in the morning and afternoon of September 21, 2004, and on October 25, 2004, I issued a Memorandum and Order granting in part and denying in part Scotts' and Monsanto's motions for summary judgment; denying AgrEvo EH's motion for partial summary judgment; and denying the motions by both sides to preclude expert testimony. This Opinion and Order comports with the holdings in my October 25, 2004 Memorandum and Order and further explains those holdings.

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers, interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law determines the facts that are material to the outcome of a particular litigation. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities, and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)(citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. However, only when it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential*

*Residential Servs., Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994).

## I. ANTITRUST CLAIMS

The undisputed relevant product market is the residential NSH market, which consists of NSH products for use by consumers for the general control of brush, weeds, and grasses in their homes and gardens, and the relevant geographic market is the United States. (Def's Antitrust 56.1 ¶¶ 6–7.) With respect to the antitrust allegations contained in the Third Amended Complaint, Defendants have moved for summary judgment on the basis that AgrEvo EH lacks standing to assert antitrust claims, on behalf of itself and its related entities, Hoechst Schering AgrEvo GmbH ("AgrEvo GmbH"), AgrEvo EH's parent company, and AgrEvo USA. Defendants have also moved for summary judgment on the basis that AgrEvo EH has failed to submit facts upon which a reasonable jury could find that Scotts and Monsanto acted anticompetitively in order to harm competition, in violation of Sections 1 and 2 of the Sherman Act.

### A. Antitrust Standing

#### 1. Appropriateness of AgrEvo EH as Plaintiff

■ Defendants argue that by consummating the transaction with Scotts for Finale, AgrEvo EH exited the residential NSH market, became a mere supplier of an ingredient for use in Finale and, therefore, lacks standing to assert antitrust claims.[4] As Defendants point out, it is well-settled that a plaintiff who exits the market does not retain standing to assert antitrust claims for anticompetitive behavior occurring within the market. *See, e.g., McDonald v. Johnson & Johnson,* 722

F.2d 1370, 1373–79 (8th Cir.1983); *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229, 1235 (6th Cir.1981); *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753, 754 (1st Cir.1980); *Argus Inc. v. Eastman Kodak Co.,* 612 F.Supp. 904, 908–14, 916 (S.D.N.Y.1985), *aff'd,* 801 F.2d 38 (2d Cir. 1986). It is equally well-established that mere suppliers of products to the targets of antitrust violators do not have standing to assert antitrust claims. *See, e.g., Billy Baxter, Inc. v. The Coca–Cola Co.,* 431 F.2d 183, 189 (2d Cir.1970); *Midwest Gas Serv., Inc. v. Indiana Gas Co.,* 317 F.3d 703, 710–11 (7th Cir.), *cert. den'd,* 540 U.S. 817, 124 S.Ct. 82, 157 L.Ed.2d 34 (2003); *Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.,* 289 F.Supp.2d 986 (N.D.Ill.2003).

In this case, there are certainly facts that suggest AgrEvo EH did exit the relevant market. Most significantly, the fact that AgrEvo EH and Scotts entered into a sales agreement for the Finale business, the Asset Sales Agreement, certainly implies an exit from the market. Additionally, the Asset Sales Agreement contains a covenant not to compete for a period of ten years, which further suggests AgrEvo EH was no longer competing in the market. (ASA § 2(i).) Similarly, none of the parties disputes that following the Finale transaction in May 1998, AgrEvo EH became the supplier of GA to Scotts. Therefore, it is certainly not incorrect to characterize AgrEvo EH as a "supplier" within the ordinary meaning of the word. Yet, simply to categorize AgrEvo EH as a former competitor that exited the market and became a mere supplier would ignore the substance and effects of the transaction with Scotts and the intent of the antitrust laws.

---

**4.** "Standing" in this context is used to denote the right to sue rather than the existence of jurisdiction. *See Asahi Glass Co., Ltd. v. Pen-* *tech Pharm., Inc.,* 289 F.Supp.2d 986, 990 (N.D.Ill.2003) (J. Posner sitting by designation).

■ The Court of Appeals has provided a two-part test for determining whether a plaintiff has antitrust standing. *See Balaklaw v. Lovell*, 14 F.3d 793, 797 n. 9 (2d Cir.1994). First, a court must determine whether the plaintiff has suffered an antitrust injury. Second, if that prong is satisfied, the court must next "determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Id.* Under this test, therefore, not all plaintiffs who suffer an injury causally linked to an antitrust violation have standing. *See Associated Gen. Contractors of California, Inc. v. California State Council*, 459 U.S. 519, 540–41, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Volvo North America Corp v. Men's Intern. Professional Tennis Council*, 857 F.2d 55, 66 (2d Cir.1998).

In order to determine whether a plaintiff has suffered an "antitrust injury" a court must determine whether the injury alleged has had an adverse effect on competition, not just on the competitor asserting the claim. *Balaklaw*, 14 F.3d at 797. As discussed in the subsequent section addressing the merits of AgrEvo EH's antitrust claims, I find that AgrEvo EH has proffered facts sufficient to raise a material question of fact as to the adverse effect Defendants' conduct had on competition, not just on AgrEvo EH, and I address here the question of the appropriateness of AgrEvo EH as a plaintiff in this action.

■ Courts evaluate the suitability of a plaintiff as an enforcer of the antitrust laws by looking to the following non-exhaustive list of factors adapted from the Supreme Court's holding in *Associated General:* (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them amongst direct and indirect victims so as to avoid duplicative recoveries. *Volvo North America Corp.*, 857 F.2d at 66; *see also Associated Gen.*, 459 U.S. at 540–45, 103 S.Ct. 897 (1983); *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir.1983) (adopting the *Associated General* test). Most relevant to the issues in this case is the first factor, which inquires whether a plaintiff has been directly injured by anticompetitive behavior. Those cases precluding recovery for those who have exited the market and are no more than suppliers are consistent with the desire to limit antitrust injury to those not merely tangentially affected by an antitrust violation. Yet, while those cases may establish a general rule regarding the directness of a plaintiff's injury, not every plaintiff who has sold some assets or could reasonably be characterized as a "supplier" lacks standing.

■ In this case, rather than having exited the market and become a mere supplier, AgrEvo EH remained a competitor "in every relevant economic sense." *See Information Resources, Inc. v. The Dun and Bradstreet Corp.*, 294 F.3d 447, 450 (2d Cir.2002) (quoting 2 Phillip E. Areeda et al., *Antitrust Law: An Analysis of Antitrust Principles and Their Application,* ¶ 348f1, at 404 (2d ed.2000)). AgrEvo EH was not supplying a minor ingredient for the use in Finale but was supplying the only active ingredient, GA, and it was supplying it to Scotts in fully formulated ready-to-use ("RTU") form. This RTU formula was then packaged and sold to retailers by Scotts without any further alteration. Later, AgrEvo EH began supplying Manufacturing Use Product

("MUP"), which was easily converted—by adding water and a few inert ingredients—into an RTU formula, a concentrate formula, or super-concentrate formula. It is undisputed that whether AgrEvo EH was supplying RTU or MUP, the GA it supplied did not change in form as it descended the manufacturing chain. *See* Areeda, *supra,* ¶ 348f3, at 405.

Similar cases have held that antitrust standing is proper for the supplier of the product when the supplied product is passed along relatively unchanged. In *Sanitary Milk Producers v. Bergjans Farm Dairy, Inc.,* 368 F.2d 679, 688–89 (8th Cir.1966), the Eighth Circuit held that raw milk producers, who did not sell directly to retailers or consumers, had standing to press antitrust claims against milk processors who were alleged to have sold milk to retailers at predatory prices. The court held that because the raw milk supplied by plaintiffs was virtually the same product ultimately sold to retailers through a sales company, the raw milk producers were not "mere suppliers" and were properly characterized as actual competitors of the defendants. *See also South Carolina Council of Milk Producers v. Newton,* 360 F.2d 414, 418 (4th Cir.1966) (holding plaintiff properly had antitrust standing because "the item sold by by plaintiffs is not simply an ingredient of the corresponding commodity sold by defendants but . . . is essentially the equivalent commodity."). Similarly, in *Karseal Corp. v. Richfield Oil Corp.,* 221 F.2d 358, 362–65 (9th Cir.1955), the court held that the supplier, Karseal, that furnished car wax to wholesalers in the same condition the wax would be sold to the retail consumer had antitrust standing. *See also Sulmeyer v. Seven–Up Co.,* 411 F.Supp. 635, 638–39 (S.D.N.Y.1976) (holding that the producer of soft drink concentrate had standing in a suit alleging anticompetitive activity in the marketing and distribution of soft drinks).

Though the cases cited in the previous paragraph pre-date the factors set forth in *Associated General* and *Volvo North American Corp.,* their logic comports with the logic and purpose of the more modern test seeking to limit antitrust recovery to those directly injured. *See IRI,* 294 F.3d at 450 (citing the above cases). Moreover, in *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 724 F.2d 290, 294 (2d Cir.1983), the Court of Appeals applied the *Associated General* test and held that antitrust standing was proper since plaintiff was "not just a 'supplier' of a competitor, to whom standing is generally denied," and additional cases have also held that suppliers are not necessarily precluded from standing. *See Amarel v. Connell,* 102 F.3d 1494, 1509–10 (9th Cir.1997); *Morris Elec. of Syracuse v. Mattel, Inc.,* 595 F.Supp. 56, 61 (N.D.N.Y.1984). Though he denied standing to the plaintiff in *Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.,* 289 F.Supp.2d 986, 991 (N.D.Ill.2003), holding that the plaintiff was a mere supplier whose antitrust injury was too remote, Judge Posner also stated that the result might have been different had plaintiff been the "target" of the antitrust violation. Had the plaintiff been the target the plaintiff would have been more directly injured and might have had standing. *Id.* Here, AgrEvo EH has proffered evidence, which, if believed would demonstrate that it was the target of the alleged antitrust violations by Scotts and Monsanto.

Because AgrEvo EH was not a mere supplier of one unimportant component of Finale, but instead supplied a product that was nearly complete and identical to the product ultimately delivered to consumers by Scotts, it cannot be said that AgrEvo EH simply exited the market and, therefore, lacks standing. The cases relied upon by Defendants such as *McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1378

(8th Cir.1983), in which plaintiffs sold their stock and accepted an earnout under the contract, for the proposition that plaintiffs who exit the market lack antitrust standing are inapposite. In cases like *Mc-Donald*, the plaintiffs did not continue to participate in the market in any meaningful manner. This is quite dissimilar from the situation here, where AgrEvo EH continued to manufacture and supply GA, the critical and virtually only ingredient in Finale, to Scotts.

The second factor in the test for assessing the suitability of a plaintiff also weighs in favor of finding standing for AgrEvo EH, since other potential plaintiffs seem unlikely to vindicate the public interest. Obviously, Scotts as an alleged co-conspirator is not going to pursue antitrust claims against itself and Monsanto. *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145–46 (9th Cir.2003). Given some of the allegations, it also seems unlikely that Farnam would pursue the antitrust claims, since, as discussed below, to do so Farnam would have to adopt the position that it is an ineffective competitor and marketer. Though NSH consumers might arguably have a strong desire to vindicate the public interest, in order for consumers to pursue such a claim there must be some likelihood that the increased costs to NSH consumers are significant enough for them to undertake an expansive, and expensive, antitrust lawsuit. There has been no such showing.

As to the third factor, AgrEvo EH's alleged lost profits as a result of Defendants' alleged antitrust violations are not speculative. *See Crimpers*, 724 F.2d at 297 (holding that lost future profits are not too speculative for antitrust damage calculations). If AgrEvo EH's allegations are proved, the profits AgrEvo EH would have earned as a result of its sales of GA are sufficiently calculable by AgrEvo EH's

damages expert, as discussed in more detail below, and reflect the damages AgrEvo EH suffered as a result of having been excluded from the market.

The concern over duplicative recovery, the fourth factor, also weighs in AgrEvo EH's favor, since, as discussed above, Scotts as a co-conspirator is unlikely to pursue any claims, as are any other potential plaintiffs.

In sum, three of the four factors clearly weigh in favor of conferring antitrust standing upon AgrEvo EH, and the factor looking to the directness of AgrEvo EH's injury ultimately supports standing as well.

Accordingly, Defendants' motion for summary judgment for lack of antitrust standing is denied.

### 2. AgrEvo EH's Standing on Behalf of Affiliates

■ AgrEvo EH was not the only AgrEvo entity involved in the production of GA. AgrEvo GmbH and AgrEvo USA were also involved in the manufacture and sale of GA. On October 26, 2001, Monsanto moved to dismiss the Third Amended Complaint on the basis that AgrEvo EH did not have standing to assert claims on behalf of the other AgrEvo entities despite the fact that the affiliates allegedly transferred their claims to AgrEvo EH for the purposes of this action. (Third Am. Compl. ¶¶ 8–9.) The Defendants now jointly renew the arguments contained in Monsanto's motion to dismiss and further contend that, like AgrEvo EH, AgrEvo GmbH and AgrEvo USA exited the market and lack antitrust standing.

With respect to the contention that the AgrEvo entities withdrew from the market as a result of the Asset Sales Agreement with Scotts and thus lack standing, as discussed above, that contention is rejected.

As to the assertion that AgrEvo EH does not have standing to assert claims on behalf of the other two entities, AgrEvo EH has proffered evidence which, if believed, would demonstrate that all three AgrEvo entities were acting as a single enterprise and shared a complete unity of interests. Similar conclusions were reached in *In re Vitamins Antitrust Litig.*, 2001 WL 755852, at *3 (D.D.C. June 7, 2001) and *Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, 1996 WL 191971, at *4 (N.D.N.Y. Apr.15, 1996), where both courts held that a parent could bring antitrust claims on behalf of its subsidiary when their interests were the same and they were treated as the same entity.[5] I am persuaded by the reasoning in those cases, and thus, on the record here, AgrEvo EH may assert claims on behalf of its parent AgrEvo GmbH and affiliate AgrEvo USA.

Accordingly, Monsanto's motion to dismiss the claims of AgrEvo EH's affiliates is denied.

### B. Substantive Antitrust Claims

Not surprisingly, AgrEvo EH and the Defendants characterize the conduct at issue in this case differently. In the Third Amended Complaint AgrEvo EH alleges that Scotts and Monsanto, through the RoundUp Agreement and other actions, unlawfully conspired to eliminate what they saw as a threat to the RoundUp monopoly in the residential NSH market.

AgrEvo EH argues that the evidence supports its contention that Monsanto, with the help of Scotts, was trying to eliminate the horizontal competition presented by Finale, which elimination harmed competition and, ultimately, consumers.[6] Conversely, Scotts and Monsanto contend that the RoundUp Agreement, and their related actions, were legitimate business activities between entities at different levels of the distribution chain. Defendants argue that there is no evidence to support AgrEvo EH's allegations that they were in any way acting anticompetitively in an effort to foreclose Finale from the market. The evidence proffered by the parties can support either characterization, and thus the characterization of Defendants' conduct is best left to the jury.

### 1. AgrEvo EH's Sherman Act § 1 Claims

Section 1 of the Sherman Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To establish such a claim plaintiff must show: " '(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason.' " *Virgin Atlantic Airways Ltd. v. British Airways PLC*, 257

---

5. These cases follow the logic, established in other antitrust contexts, that coordinated activity of a parent and its wholly owned subsidiary cannot give rise to an antitrust violation since the parent and subsidiary in such a case always share a complete unity of interest. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768–69, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

6. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Elecs. Corp. v. Sharp Elecs. Corps.*, 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The characterization of an agreement as either "horizontal" or "vertical" has important implications under the antitrust laws and to the ensuing discussion.

F.3d 256, 263 (2d Cir.2001) (quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95–96 (2d Cir.1998)).

■ Two cases are particularly instructive here. In *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990), two state bar review course providers competing in Georgia entered into an agreement whereby one of the providers was granted the exclusive license to market the other provider's material in Georgia and to use its trade name, "Bar/Bri." The Supreme Court held that the agreement effectively eliminated one of the two competitors in the market, resulted in raised prices, and that the District Court's grant of summary judgment in defendants' favor was, therefore, improper. *Id.* at 49, 111 S.Ct. 401. Similarly, in *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367 (9th Cir.2003), the Ninth Circuit held that when two competitors entered into an "alliance," whereby one competitor ceased manufacturing and selling its film editing system and became a distributor of its competitor's editing system, such that "[i]nterbrand competition was dead," a jury could find that there had been a violation of Section 1. *See also Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1 (1st Cir.1979).

Defendants here contend that the RoundUp transaction was a vertical exclusive dealing agreement that is presumptively lawful. *See Pepsico, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 110 (2d Cir.2002). They argue that Monsanto was free to choose the parties with whom it conducted business, exclusive dealing arrangements may be substantially procompetitive, Monsanto only had an arrangement with Scotts and was not tying up multiple distributors to keep other NSHs from the market, and other distributors could—and did—distribute Finale.

Defendants are correct that, all other things being equal, exclusive dealing arrangements, like the RoundUp Agreement, are presumptively lawful. However, Defendants largely ignore the fact that at the time Scotts and Monsanto entered into the RoundUp Agreement, Scotts was also the exclusive distributor of Finale—facts closer to *Palmer* and *Glen Holly Entertainment* than to *Pepsico*. There is evidence from which a jury could find that Finale was the only significant competition to RoundUp and that, as a result of the RoundUp Agreement, Finale could no longer be distributed by Scotts. Even though the RoundUp Agreement itself, viewed narrowly, was a vertical arrangement, there is evidence from which a jury could find that the transaction resulted in a diminution of horizontal competition and that it was the result of anticompetitive behavior.

Though the evidence of a violation of Section 1 is not undisputed, such that summary judgment for AgrEvo EH is appropriate, AgrEvo EH has submitted evidence from which a jury could find that Scotts and Monsanto were acting to foreclose Finale from the market and restrain trade, specifically that Monsanto was worried about the competition that Finale, then in the hands of Scotts, might pose to RoundUp and that Monsanto chose to enter into the RoundUp Agreement with Scotts to eliminate Finale as a competitor. For example, Monsanto prepared a "Competitive Assessment" of Scotts' Finale six days after the ASA was executed. The May 21, 1998, document noted Finale's comparable efficacy and safety to Round-Up, noted Scotts' abilities as a marketer, and stated there was an "opportunity" to "[s]top Scotts before they gain a foothold." (Neagle Decl. Ex. F.) Though not dispositive, a jury could certainly view the "Competitive Assessment" as tending to prove

that Monsanto was considering trying to foreclose Finale from the market.

AgrEvo EH also proffers evidence that Scotts entered into the Finale transaction solely to improve its negotiating position with Monsanto and, therefore, that Scotts was planning to work with Monsanto to eliminate Finale from the market. Notes of a meeting held on April 6, 1999, report that Scotts' Chief Financial Officer said that Scotts "bought rights for GA/Finale ... to leverage Scotts into a better position on RoundUp negotiation, wow, implied the only reason they acquired Finale rights was to secure the deal, better deal with Monsanto on RoundUp." (Neagle Decl. Ex. EE (Tr. of Joshua Hines Weeks Depo.) at 181–82.; Ex. V (Tr. of Leonard Castillo) at 58–59.) [7] Also, there is at least some evidence from which a jury could find Scotts assigned its distribution rights to Farnam because Scotts believed that Farnam would not be able to market and distribute Finale as successfully as Scotts. *Cf. United States v. Visa U.S.A., Inc.*, 163 F.Supp.2d 322, 379 (S.D.N.Y.2001) (holding that there could be an unlawful restraint of trade even if other distribution channels still existed), *aff'd*, 344 F.3d 229 (2d Cir. 2003). Despite Defendants' characterization of the RoundUp Agreement as vertical, their actions may not be analyzed in a vacuum, and the proffered evidence could support a jury's finding that Scotts and Monsanto acted in conjunction with one another and that their actions constituted an unreasonable restraint of trade.

■ While AgrEvo EH has presented evidence raising a genuine issue as to whether Defendants acted in concert and unlawfully in order to foreclose Finale from the market and restrain trade, the evidence does not justify summary judg-ment on the Section 1 claim. There remain material questions of fact that should be evaluated by the jury pursuant to the rule of reason, such as whether Defendants' actions increased competition.

■ Though AgrEvo EH argues that the Defendants' actions ought to be evaluated as a *per se* illegal restraint, in order to be considered a *per se* violation the practice must appear on its face "to be one that would always or almost always tend to restrict competition and decrease output," rather than one designed to "increase economic efficiency and render markets more, rather than less, competitive." *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Additionally, "there is a presumption in favor of a rule-of-reason standard," *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 725, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988), and there is no reason to depart from that presumption in this case. *See also Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir.1999) ("Only 'manifestly anticompetitive' " conduct, however is designated *per se* illegal. The majority of allegedly anticompetitive conduct continues to be examined under the "rule of reason.") (internal citations omitted). As was the case in *Palmer, Glenn Holly Entertainment*, and *Engine Specialties*, cited above, there may have been some horizontal effect on competition; unlike in those cases, however, that effect may be a permissible ancillary restraint growing out of a lawful vertical arrangement. *See also Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir.1999); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir.1985). A jury may ultimately find that Scotts and

---

7. Without making a final ruling as to the admissibility of this evidence at trial, for the purposes of this Order this evidence is deemed to be an admission against interest. *See* Fed.R.Evid. 801.

Monsanto did act unlawfully to restrain trade, but under the circumstances of this case, Defendants' actions cannot be said to fit into that narrow category of activity that is so pernicious and universally anticompetitive that it should be evaluated under the *per se* analysis.

### 2. AgrEvo EH's Sherman Act § 2 Claims

To establish a claim of monopolization in violation of Section 2 of the Sherman Act, a plaintiff must demonstrate: "(1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Pepsico,* 315 F.3d at 105. The Supreme Court has recently helped clarify the second element by stating that: "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 124 S.Ct. 872, 879, 157 L.Ed.2d 823 (2004). To demonstrate an attempted monopolization claim under Section 2, a plaintiff must establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Pepsico,* 315 F.3d at 105 (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

For the purposes of their motion for summary judgment, Defendants concede Monsanto's market power. (Def's Merits Br. at 24 n. 7.) Therefore, the only questions remaining relate to the legality of Monsanto's actions, since a "monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market." *United States Football League v. National Football League,* 842 F.2d 1335, 1360–61 (C.A.2 (N.Y.)1988). As stated above, AgrEvo EH has offered evidence such that a reasonable juror could find that Monsanto was acting to preclude its nearest competitor from the market and preserve its conceded monopoly power. For example, as noted above, the May 21, 1998 Monsanto memorandum—written six days after Scotts became the exclusive marketer for Finale—states that Monsanto saw an opportunity to "stop Scotts" from distributing Finale before it got a "foothold." (Neagle Decl. Ex. F.) Monsanto may be able to convince a jury that its actions were not anticompetitive, but a jury might also reasonably infer that Monsanto's conduct was a willful maintenance, or attempt to retain, its monopoly. In light of the conflicting evidence, summary judgment on AgrEvo EH's Section 2 claims is inappropriate.

### 3. Adverse Effects on Output, Quality and Price

As to Defendants' contention that even if Scotts and Monsanto foreclosed Finale from the market there is no evidence of damages, this is also a question for the jury.

It is an oft-stated tenet that the antitrust laws are meant to protect competition and not competitors. *See Balaklaw v. Lovell,* 14 F.3d 793, 797 (2d Cir.1994). In other words, if AgrEvo EH was harmed as a result of Scotts' and Monsanto's actions, but NSH consumers suffered no ill effects, then there would be no violation of the antitrust laws. To demonstrate harm to competition, a plaintiff must show that there has been an adverse effect on prices, output, or quality of goods in the relevant market as a result of the challenged actions. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 31, 104 S.Ct.

1551, 80 L.Ed.2d 2 (1984); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 541 (2d Cir.1993).

■ Though predicting what would have happened had the challenged actions of Defendants never occurred is well nigh impossible, AgrEvo EH's expert has provided evidence to support the contention that competition was harmed. An allegedly improved version of RoundUp being developed by Monsanto was never introduced to the market. Evidence of such a retardation of innovation and subsequent decrease in the quality of NSHs potentially available to consumers, if believed, could qualify as a harm to competition and consumers. Likewise, if a decrease in the price of RoundUp would have occurred as result of Finale's growth in the market, then that effect on price could also qualify as a harm to competition. Defendants' contention that new NSH products have entered the market may certainly be relevant to their argument that competition has not been substantially foreclosed. However, the conflicting evidence proffered on the effects of competition make summary judgment inappropriate.

Accordingly, Defendants' motion for summary judgment on AgrEvo EH's Section 1 and 2 antitrust claims on the merits is denied, AgrEvo EH's motion for partial summary judgment on its Section 1 claim is denied, and AgrEvo EH's antitrust claims shall be evaluated at trial pursuant to the rule of reason analysis.

## II. STATE CLAIMS

### A. Scotts' Motion for Summary Judgment on Plaintiff's Contract Claims

#### 1. Alleged Breaches of the Glufosinate Ammonium Supply Agreement

##### a. Breach of the Implied Best Efforts Clause

■ Under the terms of the GA Supply Agreement, AgrEvo EH was to supply Scotts with its requirements of GA for use in Finale for five years. The first three years of the GA Supply Agreement were on an exclusive basis, and AgrEvo EH contends that this exclusivity triggered an implied "best efforts" clause under Delaware law, which obligates a buyer to use its best efforts in promoting the sale of the goods purchased from the seller on an exclusive basis. *See* 6 Del.C. § 2–306(2). AgrEvo EH alleges that by abandoning its efforts to promote and sell Finale, after entering into the RoundUp Agreement with Monsanto, this implied "best efforts" clause of the GA Supply Agreement was breached by Scotts.

Similarly, AgrEvo EH alleges that Scotts' abandonment of its efforts to promote and sell Finale was a breach of Scotts' obligations, allegedly created prior to the parties' execution of the GA Supply Agreement, to market Finale effectively. Specifically, AgrEvo EH contends that Scotts had represented that it would invest $15 million per year in advertising Finale, would capture a 25% market share, and would "dethrone" RoundUp as the leading NSH. According to AgrEvo EH, these representations define what would have occurred had Scotts fulfilled its "best efforts" obligations under the GA Supply Agreement.

While there is no dispute that the Delaware statute implies a "best efforts" clause in exclusive dealing contracts for the sale of goods, parties are free to enter into contracts that eliminate this implied duty: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes *unless otherwise agreed* an obligation by the seller to use the best efforts to supply the goods and by the buyer to use best efforts to promote their sale." 6 Del.Code 2–306(2)

(emphasis added). It is quite clear that the take-or-pay provision of the GA Supply Agreement demonstrates that the parties "otherwise agreed" to preclude the implied "best efforts" obligation.

The "best efforts" doctrine was created to protect one party who is at the complete mercy of another party in an exclusive dealing contract, but the doctrine is no longer necessary when the parties to an exclusive dealing contract have expressly negotiated provisions in the contract to protect the parties' financial interests. *See* 2–6 Corbin on Contracts § 6.5 ("the principal pillar of the finding of a reasonable efforts obligation was the senselessness of granting exclusivity without the reasonable expectation of receiving a commitment in return."). Section 1.11 of the GA Supply Agreement obligated Scotts to purchase $12.6 million worth of GA during the first three years of the contract. In addition to this $12.6 "Minimum Dollar Commitment" requirement, however, pursuant to the take-or-pay provision in § 2.3 of the GA Supply Agreement, Scotts was also permitted to pay AgrEvo EH fifty cents for each dollar short of the "Minimum Dollar Commitment" in its purchases of GA. Simply put, Scotts could fulfill its full purchase requirement by "taking" $12.6 million worth of GA from AgrEvo EH or, if Scotts chose not to purchase any GA, "paying" $6.3 million to AgrEvo EH. In light of the take-or-pay provision, AgrEvo EH was hardly at the mercy of Scotts—under the GA Supply Agreement AgrEvo EH was *guaranteed* to gross either $12.6 million from sales of GA or profit $6.3 million.[8] With the inclusion of the take-or-pay provision in the contract, AgrEvo EH was well-protected, and the implied "best efforts" clause was unnecessary.

Perhaps surprisingly, there appear to be no reported Delaware cases addressing the statute that implies the "best efforts" clause in contracts for the sale of goods unless "otherwise agreed." *See Textile Biocides, Inc. v. Avecia, Inc.*, 2001 WL 1855059 (Pa.Com.Pl.2001) ("there appears to be no published case addressing UCC § 2–306(2) under Delaware law"). However, cases addressing the similar common law doctrine of implied "best efforts" in exclusive dealing contracts have held that no such clause is implied if, like here, provisions in the contract guarantee payments. *See* 2–6 Corbin on Contract § 6.5 (noting that *Wood v. Lucy, Lady, Duff–Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917), in which Justice Cardozo created the "best efforts" doctrine to protect a party to an exclusive dealing contract otherwise at the mercy of the other party, "is clearly the ancestor of Uniform Commercial Code ("U.C.C.") 2–306."). In *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3d Cir.2001), for example, Emerson and Orion entered into an exclusive trademark licensing contract with a term of three years. Emerson sued Orion claiming that in light of the exclusive nature of the contract Orion had an implied obligation to use "reasonable efforts" to sell and market the Emerson products, which the district court rejected. The Court of Appeals, agreeing with the district court's reasoning in granting summary judgment, held that because Orion was required to make a minimum $4 million annual royalty payment, there was no implied obligation to use "best efforts." *Id.* at 166. Since the minimum royalty payment protected Emerson from the possibility that Orion would not use its best

---

8. The parties do not dispute that on October 21, 2001, Aventis invoiced Scotts for 50% of Scotts' alleged GA purchase shortfall of $11,768,000, or $5,884,000, and that Scotts paid this invoice in full.

efforts to sell or market the Emerson products, there was no reason to imply a "best efforts" obligation. *Id.* at 169 (distinguishing *Wood v. Lucy, Lady Duff–Gordon*). *See also Permanence Corp. v. Kennametal,* 908 F.2d 98, 101–02 (6th Cir. 1990) (no "best efforts" obligation to exploit patents implied when $150,000 was paid for the exercise of the option for grant of exclusive agency and $100,000 was paid in advance royalties); *Vacuum Concrete Corp. of America v. American Mach. & Foundry,* 321 F.Supp. 771, 773–774 (S.D.N.Y.1971) (holding that there was no implied "best efforts" clause in an exclusive dealing contract when there was a guaranteed royalty payment and right to terminate the contract).

In addition to the inclusion of the take-or-pay provision to protect AgrEvo EH's financial interests, further evidence that the parties "otherwise agreed" not to have a "best efforts" clause in the GA Supply Agreement comes from the fact that, unlike some of the preliminary discussions leading up the agreement, the final GA Supply Agreement does not contain any marketing or promotional obligations. Scotts' non-binding letter of intent did contain specific advertising budgets and market share projections, and AgrEvo EH representatives proposed market share requirements during negotiations leading up to the GA Supply Agreement.

Yet, any mention of money to be spent on advertising by Scotts or market shares to be attained by Scotts is conspicuously absent from the GA Supply Agreement. Rather than demonstrate what Scotts should have attained had it fulfilled the implied "best efforts" clause, as AgrEvo EH contends, the failure to include terms in the GA Supply Agreement pertaining to the proposed 25% market share requirement and $15 million annual advertising budget for Finale is more properly viewed

as evidence that such obligations were considered and rejected. *See Eastern Elec., Inc. v. Seeburg Corp.,* 427 F.2d 23, 27 (2d Cir.1970) ("It is surely of some significance in deciding whether an agreement contains an implied obligation that the party so arguing tried to make the obligation explicit and failed."). The position that no promotional obligations were meant to be included in the final agreement is further bolstered by the integration clause contained in Section 18.1, which states: "This Agreement contains all the terms and conditions of sale and purchase between the parties hereto and supersedes any oral or other agreements between the parties relating to the subject matter hereof." *See HML Corp. v. General Foods Corp.,* 365 F.2d 77, 82 (3d Cir.1966) (when a contract contains an explicit statement that it incorporates the entire agreement "the agreement cannot be altered by the plaintiff's effort to show a parol representation that defendant would exert additional effort to promote the product."); *J.A. Moore Constr. Co. v. Sussex Assocs. Ltd. P'ship,* 688 F.Supp. 982, 987 (D.Del.1988) (a merger clause is "conclusive evidence that the parties intended the written contract to be their complete agreement"); *see also Permanence Corp.,* 908 F.2d. at 102.

Other aspects of the GA Supply Agreement suggest that the parties intended not to have a "best efforts" clause for the marketing and selling of Finale included in the contract. For instance, numerous sections of the GA Supply Agreement explicitly state that the parties are to use their "best efforts" in performing certain obligations, such as Section 5.3 which requires that AgrEvo EH use its "best efforts" to deliver the quantities of GA ordered. *See also* GASA §§ 5.1, 11.2 & 7.5. Reading the contract as a whole, the failure to include an explicit "best efforts" clause for the alleged obligation of Scotts to promote and sell Finale, when the parties have

included "best efforts" clauses for other obligations, suggests that the parties chose not to bind Scotts by such an obligation. Finally, the "sole remedy" provision in Section 17.1 of the GA Supply Agreement also suggests that the take-or-pay provision was the only recourse available to AgrEvo EH should Scotts choose not to perform its obligations in a way that satisfied AgrEvo EH. To permit the possibility of recovery beyond what is calculated in accordance with the take-or-pay provision would be to permit a contractual recovery directly at odds with the sole remedy provision contained in the GA Supply Agreement.

That Scotts and AgrEvo EH discussed market share predictions and promotional requirements during negotiations is undisputed. That in entering into the GA Supply Agreement AgrEvo EH assumed Scotts would purchase large quantities of GA, aggressively market and advertise Finale, and work to achieve a larger market share for Finale can also hardly be doubted. However, AgrEvo EH's assumptions are irrelevant in light of a GA Supply Agreement that quite clearly did not transform these assumptions into obligations for Scotts.

### b. Breach of the Implied Covenant of Good Faith

 In a manner that parallels its opposition to the imposition of a "best efforts" clause, Scotts opposes the notion that the implied covenant of good faith can create certain marketing and sales obligations that the parties chose not to include in the GA Supply Agreement. Yet, while AgrEvo EH's claims based on the implied "best efforts" obligations are properly characterized as an attempt to recapture obligations explicitly rejected by the parties, the claims based on the alleged breach of the implied covenant of good faith are somewhat different. *See Emerson Radio Corp.*, 253 F.3d at 172 (dismissing plaintiff's claims for breach of the implied "best efforts" covenant but permitting a claim based upon an alleged breach of the implied covenant of good faith to proceed based upon a question of fact as to whether defendant acted in bad faith to decrease plaintiff's sales and increase its own sales). AgrEvo EH's claims based on the implied covenant of good faith do not relate to the issue of whether Scotts complied with specific terms of the GA Supply Agreement but rather relate to the way in which the parties dealt with one another during the life of the GA Supply Agreement. As discussed below, even if the parties agreed not to include a best efforts obligation, there is a genuine issue of material fact as to whether Scotts acted in bad faith in deciding to purchase no more than a *de minimus* amount of GA.

Delaware statutes, modeled after the U.C.C., impose an obligation of good faith for all contracts for the sale of goods, and this duty may not be disclaimed by agreement. *See* 6 Del.Code §§ 1–201(19), 1–203, 1–302(b) & 1–304. More specifically, Section 2–306(1) imposes an obligation of good faith in output contracts like the GA Supply Agreement. 6 Del.Code. § 2–306(1). Though cases applying the good faith statutes derived from the U.C.C. in exclusive dealing or requirements contracts are limited, Delaware courts addressing the implied covenant of good faith in other contexts have held that while the implied covenant "cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract," the implied covenant is designed to protect the spirit of the agreement and to keep one party from using "oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Chamison v.*

*HealthTrust, Inc.*, 735 A.2d 912, 921 (Del. Ch.1999). Though the doctrine of good faith is to be used sparingly, the implied covenant of good faith is applicable even when no express term of the agreement has been violated. *Id.* at 920, 921 n. 33.

As discussed in the preceding subsection, under the terms of the GA Supply Agreement Scotts did have the right not to purchase any GA from AgrEvo EH. This was not, however, an absolute right that would excuse bad faith performance by Scotts. Though the concept of what constitutes a breach of good faith is somewhat amorphous, if a jury were to find that Scotts was motivated not to purchase any GA in an effort to destroy Finale as a competitor to RoundUp or was motivated to enter into the GA Supply Agreement solely to harm AgrEvo EH and increase Scotts' bargaining position with Monsanto, then a jury could find that Scotts did breach the implied covenant of good faith. Judge Posner discusses such a situation in the leading case on good faith in requirements contracts, *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1339 (7th Cir.1988)(applying analogous Illinois law based on the U.C.C.), and notes that if the defendant reduced its purchases of plaintiff's goods in order to harm plaintiff, perhaps because plaintiff was a competitor in some other market, that could qualify as a bad faith performance and contractual breach. Conversely, Judge Posner also explains that if a defendant had a business reason for reducing its purchases, such as a drop in demand for plaintiff's product, then defendant would not be acting in bad faith and would not breach the contract. *Id.* Therefore, in spite of the fact that the results for plaintiff would be the same—reduced sales to defendant—there must be an inquiry into the subjective motivations behind the defendant's decision to purchase a reduced amount of goods. The question remaining in this case, therefore, is not simply whether Scotts had the right to reduce its purchase of GA—it did—but whether Scotts did or did not act in bad faith in reducing its purchases of GA to virtually nothing. This is not a question that I may answer. Instead an evaluation of Scotts' subjective motivations is a question of fact that must be submitted to a jury. *See MDC Corp. Inc. v. John H. Harland Co.*, 228 F.Supp.2d 387, 396–97 (S.D.N.Y.2002) (applying New York's version of the U.C.C.).

Additionally, unlike in the "best efforts" context, the "sole remedy" provision of Section 17.1 of the GA Supply Agreement cannot be used to limit Scotts' liability should a jury find that Scotts did breach the implied covenant of good faith. Consistent with Section 1–302(b), which prevents parties from being able to disclaim the implied covenant of good faith by agreement, and the general contract principle recognized by Delaware courts that a party may not protect itself from liability for fraudulent actions or bad faith, the "sole remedy" provision does not preclude AgrEvo EH's claim based upon breach good faith from going forward. *See J.A. Jones Constr. Co. v. Gen. Elec. Co.*, 372 A.2d 540, 545 (Del.Super.Ct.1977).[9]

Accordingly, Scotts' summary judgment motion is granted as to AgrEvo EH's claims based upon the implied "best efforts" obligation in the GA Supply Agree-

---

9. Though these holdings do not speak to what may or may not be considered appropriate damages should a jury find Scotts liable for breach of the implied covenant of good faith, I do reiterate that the alleged commitments by Scotts to spend $15 million on advertising and to achieve a 25% market share are not obligations under the GA Supply Agreement. Therefore, damages, if any, need not necessarily relate to the sales that would have occurred had these two commitments been fulfilled.

ment but denied as to AgrEvo EH's claims based upon the implied covenant of good faith and fair dealing.

### 2. Improper Assignment of the Contract to Farnam

 Though Scotts contends that the GA Supply Agreement was not assigned to Farnam, I find it difficult to characterize the transaction that occurred as anything but an assignment. Though Scotts did retain the obligation to satisfy the take-or-pay provision for any shortfalls, and in fact did satisfy that obligation, Scotts entered into an "Asset Purchase Agreement" with Farnam (the "Farnam APA"), which provided that Farnam "shall have the right, but not the obligation, to make purchases of [GA] under the AGREVO SUPPLY AGREEMENT [a/k/a the "GA Supply Agreement"]," and that Farnam "may solicit and sell GA to other PERSONS." (Farnam APA § 7.10.)

Even though the transfer of the right to purchase GA pursuant to the GA Supply Agreement and to sell a GA-based NSH was not a transfer of every last right and obligation enumerated in the GA Supply Agreement, the transfer of these particular rights is sufficient to qualify as an assignment. *See* 29 Richard A. Lord, *Williston On Contracts* § 74.10 (4th ed.2003). This comports with the GA Supply Agreement, which explicitly prohibited Scotts from assigning "rights" and was not limited to a prohibition against the contemporaneous assignment of every right and obligation in the contract. (GASA § 12.1.)[10]

To find that there was no assignment of rights to Farnam by Scotts would run counter to the facts in the record.[11]

Despite holding that Scotts did assign at least certain rights to Farnam, however, AgrEvo EH has not demonstrated any damages based on this assignment. As discussed above, the GA Supply Agreement was a supply agreement, and did not incorporate the promotional or market share obligations that had been discussed during negotiations. Therefore, the sole remedy available for any failure to purchase the minimum amount of GA under the GA Supply Agreement was limited to the amount set forth pursuant to the take-or-pay provision. (GASA § 17.1.) AgrEvo EH may not now expand the scope of its available recovery based on the assignment of certain rights to Farnam. Pursuant to the take-or-pay provision, AgrEvo EH was entitled to was 50% of the difference between actual purchases and the minimum dollar commitment, and whether Farnam or Scotts was the party not purchasing GA was irrelevant to AgrEvo EH's entitlement. Scotts satisfied the take-or-pay obligation, and, therefore, no damages are left to be recovered.

Accordingly, Scotts' motion for summary judgment is granted as to AgrEvo EH's claims based upon Scotts' assignment of the GA Supply Agreement to Farnam.

### 3. Alleged Breaches of the Insecticide Sales Agreement

 Similar to allegations regarding Scotts' breach of the implied covenant of

---

**10.** Section 12.1 reads: "Except as to Affiliates, neither party may assign its rights or delegate its performance hereunder, whether by operation of law or otherwise, without the prior written consent of the other party, which consent shall not be unreasonably withheld; and any attempted assignment or delegation or transfer without such consent shall be void."

**11.** The parties do not address, and I do not reach, the issue of whether the assignment to Farnam would constitute a breach of the GA Supply Agreement in light of the requirement that consent to assignment "shall not be unreasonably withheld."

good faith in the GA Supply Agreement, AgrEvo EH alleges that Scotts breached the implied covenant of good faith in the Insecticide Supply Agreement. For reasons similar to those stated above, AgrEvo EH has raised a genuine issue of material fact as to whether the implied covenant of good faith was breached with regard to the Insecticide Supply Agreement.

Unlike the GA Supply Agreement, however, there is an ambiguity as to whether the Insecticide Supply Agreement was merely a supply agreement or included marketing obligations for Scotts, and there is an additional ambiguity whether some minimum purchase was required under the contract. Further, if such obligations existed, there is then a question of fact as to whether Scotts' performance breached those requirements.

An ambiguity exists when the language in a contract permits two or more reasonable interpretations. *Hallowell v. State Farm Mutual Auto. Ins. Co.*, 443 A.2d 925, 926 (Del.1982). If an ambiguity exists as to the contract, then the interpretation and resolution of the ambiguity is a question of fact, and summary judgment is inappropriate. *See Kysor Indus. Corp. v. Margaux, Inc.*, 674 A.2d 889, 898 (Del.Super.Ct.1996); *see also Boston Five Cents Sav. Bank v. Department of Hous.*, 768 F.2d 5, 7–8 (1st Cir.1985) (Judge Breyer, now Justice Breyer of the United States Supreme Court, wrote "an argument between parties about the meaning of a contract is typically an argument about a 'material fact,' namely, the factual meaning of the contract.").

In the Insecticide Supply Agreement, Section 4.1(4) states "Purchase Prices set forth in Exhibit 1.12 reflect Buyer's and Seller's anticipation of growth in [Scotts'] demand for Supplied Products to total volumes of purchases of insecticides equivalent to twenty percent (20%) of Market

Share by the end of the Term." Section 17.4 addresses what the parties are to do should third parties introduce insecticides that compete with the products being supplied by AgrEvo EH to Scotts. In the context of the entire agreement, these provisions make it unclear whether Scotts was obligated to try to attain a market share of 20% or whether the 20% market share provision and third party entry provision are related only to renegotiation of prices. Viewed in conjunction with other provisions in the contract, these sections also raise a question whether the Insecticide Supply Agreement contemplated that Scotts might not purchase any insecticide products or was meant to obligate Scotts to purchase a certain minimum amount of insecticide products.

Unlike the GA Supply Agreement, the Insecticide Supply Agreement could reasonably be read to be more than a mere supply agreement. There is no provision comparable to the take-or-pay provision that clearly demonstrates that the parties intended to permit Scotts the option to purchase no product. Additionally, the discussion of market shares in the actual agreement, rather than in pre-agreement non-binding letters of intent, distinguishes the Insecticide Supply Agreement from the GA Supply Agreement and raises the possibility that the Insecticide Supply Agreement was meant to include certain marketing obligations for Scotts. Therefore, because there are questions of fact related to the interpretation of the Insecticide Supply Agreement, summary judgment is inappropriate as to what obligations were imposed on Scotts by the Insecticide Supply Agreement and whether those obligations, if they existed, were breached.

Accordingly, Scotts' motion for summary judgment is denied as to AgrEvo EH's

claims based upon alleged breaches of the Insecticide Supply Agreement.

### 4. Alleged Obligation to Enter Into Good Faith Negotiations

■■■ AgrEvo EH contends that Section 20(ii) of the Asset Sales Agreement obligated the parties to engage in negotiations and that Scotts' failure to enter into negotiations pursuant to this provision was a breach. Section 20(ii) of the Asset Sales Agreement states that the parties were "to use best efforts ... within 90 days of Closing to have met and begun good faith negotiations intended to reach agreement on those matters set out in Exhibit 20(ii) attached hereto." Exhibit 20(ii) is a list of products to be potentially supplied by AgrEvo EH to Scotts.

It is classic hornbook law that a mere "agreement to agree" or "a contract to contract" in the future is a legally unenforceable provision. *See Hammond & Taylor, Inc. v. Duffy Tingue Co.,* 161 A.2d 238, 239 (Del.Ch.1960). Such agreements are too indefinite to bind parties, and Scotts submits that Section 20(ii) is too indefinite to create an obligation for it to negotiate.[12]

Though standing alone Section 20(ii) is indefinite, AgrEvo EH submits that Scotts' letter of intent ("LOI"), dated March 24, 1998, set forth sufficiently definite terms to make Section 20(ii) more than a mere agreement to agree. Specifically, the most relevant portion of the March 24, 1998, letter states:

> Subject to confirmation of product efficacy and negotiation of pricing and other terms, Scotts Consumer Lawns business unit is willing to discontinue advanced negotiations with another supplier and enter into exclusive negotiations to make AgrEvo its exclusive supplier of pyrethroids. Our Consumer Lawns business unit expects to purchase between 20,000 and 25,000 pounds of Deltamethrin per year once replacement of our entire line of organo phosphate based combination products is completed, potentially as early as fiscal year 1999.

(LOI at 3.)

Though true that this letter did mention one essential term, quantity, other essential terms are lacking. *See Hindes v. Wilmington Poetry Soc'y,* 138 A.2d 501, 503 (Del.Ch.1958). Most notably, Scotts explicitly conditioned its desire to begin discussions about entering into an agreement regarding pyrethroids on a demonstration of efficacy. Thus, similar to the situation in *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989), this is not a situation in which the parties must merely work out a few details or formalize an agreement on essential terms after manifesting an intent to be bound. Similar to *Arcadian Phosphates,* a reasonable juror could not interpret Scotts' statement in the letter of intent as anything more than a statement that Scotts was contemplating the possibility of discussing entering into binding supply agreements at some undefined future date. *Id.* This is an example of a mere agreement to agree and is unenforceable. Compare *Itek Corp. v. Chicago Aerial Indus., Inc.,* 248 A.2d 625, (Del.1968) (holding that where the parties met and orally agreed to the essential terms, a trier of fact could reach the conclusion that defendant had failed to exercise reasonable effort to agree on final terms of the contract).

---

12. If Section 20(ii) were enforceable, whether Scotts did engage in good faith negotiations would be a question of fact for the jury to consider, and, therefore, Scotts does not submit evidence on this point.

Accordingly, Scotts' motion for summary judgment based upon AgrEvo EH's claims that Scotts failed to enter into good faith negotiations pursuant to the Asset Sales Agreement is denied.

### B. Tortious Interference With Business Relations

■ AgrEvo EH alleges in the Third Amended Complaint that Monsanto interfered with AgrEvo EH's business relations with Scotts by engaging in "practices designed to foreclose and exclude Plaintiff from the market." (Third Am. Compl. Count IX.) AgrEvo EH is essentially arguing that by entering into the RoundUp Agreement with Scotts, Monsanto was interfering with the relationship between AgrEvo EH and Scotts to sell Finale—in other words, but for Monsanto's meddling, AgrEvo EH would have sold a lot more GA to Scotts and made a lot more money.

The elements of a claim for tortious interference with business relations, also known as tortious interference with *prospective* business relations, are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) there was a resultant injury to the business relationship. *Nadel v. Play–By–Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir.2000). Though AgrEvo EH recognizes the difficulty, and makes a good faith effort to deal with the problem, AgrEvo EH cannot get past the fact that regardless of a whether the elements above can be satisfied, in a claim for tortious interference with business relations there is an additional requirement that the interfered-with business relations have not become actual, fully executed contracts. *See Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F.Supp.2d 384, 391 n. 1 (S.D.N.Y.2000); *D'Andrea v. Rafla–Demetrious*, 3 F.Supp.2d 239, 250 (E.D.N.Y.1996), *aff'd*, 146 F.3d 63 (2d Cir. 1998). AgrEvo EH may dispute what rights and obligations are created by the Asset Sales Agreement, the GA Supply Agreement and Insecticide Supply Agreement, but there can be no doubt that those agreements are actual, fully executed, and binding contracts. Accordingly, a claim for tortious interference with contract against Monsanto cannot stand.

■ Perhaps realizing the difficulty of maintaining a claim for tortious interference with business relations, in its opposition to Monsanto's motion for summary judgment AgrEvo EH asks that its claim for tortious interference with contractual relations be reinstated. (Pl's Tortious Interf. Opp. Br. at 16.) I dismissed that claim following oral argument on the defendants' motions to dismiss the Second Amended Complaint holding that AgrEvo EH had failed adequately to plead an intentional procurement of a breach by Monsanto. *AgrEvo Envtl. Health, Inc. v. Scotts Co.*, 99 CV 4015(LAP), 2000 U.S. Dist. Lexis 9544, at *49–50 (S.D.N.Y. June 20, 2000). A request in an opposition brief to a motion for summary judgment marshaling new facts is an improper means for requesting reinstatement of a previously dismissed claim, and I decline to entertain such a request.[13] *See Katona v. Federal*

---

13. AgrEvo EH could have moved for reconsideration of the dismissal within ten days of entry of the order on June 20, 2000. *See* Local Rules of the U.S. Dist. Courts for the S.D.N.Y. and E.D.N.Y., Rule 6.3 ("A notice of motion for reconsideration or reargument *of a court order determining a motion* shall be served within ten (10) days after *the entry* of the court's determination of the original motion") (emphasis in original). Raising the issue in an opposition brief four years after the original order certainly does not comport

*Express Corp.,* 95 Civ. 10951(JFK), 1999 WL 13735, at *3 (S.D.N.Y. January 12, 1999) (Rule 6.3 precludes a party from introducing new evidence on a motion for reconsideration without a court order so as to prevent a party from " 'plugging the gaps of a lost motion with additional matters' ") (quoting *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y. 1988)).

Accordingly, Monsanto's motion for summary judgment on AgrEvo EH's tortious interference claims is granted.

### III. Expert Testimony

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), district courts retain their role "as the gatekeeper for expert testimony." *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997). Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert. If this threshold requirement is met, then a court must inquire into whether the scientific, technical or other specialized testimony provided by that expert is both relevant and reliable. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *see also F.D.I.C. v. Suna Assocs., Inc.,* 80 F.3d 681, 686 ("It is well-established that 'expert testimony must be based upon reliable theories or principles.' " (quoting Glen Weissenberger, Federal Evidence 346 (2d ed.1995))).

The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See, Baker v. Urban Outfitters,* 254 F.Supp.2d 346, 353 (S.D.N.Y.2003) (citing *Cayuga Indian Nation v. Pataki,* 83 F.Supp.2d 318, 322 (N.D.N.Y.2000)). Though the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is "speculative" or "conjectural" or if it is based on assumptions "so unrealistic and contradictory as to suggest bad faith." *See Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996). Moreover, the Supreme Court has emphasized, in addressing the distinction between methodology and conclusions, that:

> [N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### A. Defendants' Motion to Exclude the Testimony of Dr. Ronald L. Martin

■ AgrEvo EH's damages expert, Dr. Martin, submitted his original expert report on April 25, 2003, which calculated

---

with Local Rule 6.3. Additionally, if after the ten-day period AgrEvo EH felt that newly discovered facts could have affected my previous order, a motion could have been brought within a reasonable amount of time pursuant to Rule 60(b) of the Federal Rules of Civil Procedure seeking relief from the prior order. No such motion was ever filed.

AgrEvo EH's damages to be $70 million (the "Original Report"). Following the submission of reports by Defendants' experts, Dr. Martin submitted a rebuttal report on October 3, 2003, in which he reduced his calculation of AgrEvo EH's damages to $49 million (the "Rebuttal Report"). Defendants' motion contends that Dr. Martin's Rebuttal Report is not admissible because it contains improper rebuttal or supplemental testimony, because it relies on an entirely new methodology and because Dr. Martin's damages calculations are flawed to such a degree that *Daubert* and *Kumho Tire* require his testimony be precluded.

As to Defendants' contention that Dr. Martin applied a whole new methodology in his Rebuttal Report, I do not find that to be the case. The changes reflected in the Rebuttal Report related to the MUP price, profit margins, and mitigation do not constitute in wholesale alterations of Dr. Martin's methodology. Instead, viewing Dr. Martin's methodology as the damage equation, the changes about which Defendants' complain are more analogous to changes to the numbers plugged into that equation. While Dr. Martin may be precluded from coming up with a completely different equation in his Rebuttal Report, a revision of the numbers is permissible under Rule 26 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 26(b)(4)(A); *Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.*, 199 F.R.D. 484, 486–87 (E.D.N.Y.2001).

Defendants are free to challenge the basis and source for Dr. Martin's numbers, but a challenge to the facts or data relied upon by Dr. Martin does not go to the admissibility of his testimony, but only to the weight of his testimony. *See Concise Oil & Gas P'ship v. Louisiana Interstate Gas Corp.*, 986 F.2d 1463, 1476 (C.A.5 (La.) 1993); *MacQuesten Gen. Contracting, Inc.*

*v. HCE, Inc.*, 2002 WL 31388716, at *2 (S.D.N.Y. Oct.22, 2002). Defendants may cross-examine Dr. Martin at trial regarding his assumptions and the information that was reported to him but they have failed to show any reason why Dr. Martin's damage testimony should be precluded. Additionally, unlike cases precluding rebuttal testimony on the basis of prejudice to the opposing party or procedural gamesmanship, Dr. Martin's Rebuttal Report was submitted more than a year before the scheduled trial date, and Defendants had the opportunity to depose Dr. Martin for an additional two days following the submission of the Rebuttal Report. *Compare Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 737–38 (C.A.7 (Ill.)1998) (expert reports filed late after repeated warnings and extensions containing no basis for their conclusory opinions excluded); *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C.2002) (rejecting expert rebuttal testimony, which included an entirely new test, because the testimony was not supplemental under Rule 26(e) and for failure to comply with court ordered discovery plan); *In re Omeprazole Patent Litig.*, 2002 WL 287785, at *4 (S.D.N.Y. Feb.27, 2002) (expert testimony precluded when new reports relying on previously undisclosed documents were submitted after trial had commenced).

As to Defendants' argument that Dr. Martin's testimony, based on the Rebuttal Report, will be so speculative that I should exercise my "gatekeeper" function and exclude his damage testimony, I see no basis for such an exclusion. Dr. Martin's sales forecasts, mitigation calculations, profit margin assumptions, and assumptions as to the number of years that Scotts would have purchased GA but for Defendants' actions are not immutable facts to be blindly accepted by the jury, nor are his damage calculations so speculative that

they should be stricken.[14] A jury is fully capable of assessing such evidence.

Dr. Martin's calculations based upon sales forecasts do not lack a rational basis. *See FH Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1260 (C.A.2 (N.Y.)1987). The sales projections, prepared not by AgrEvo EH but by Scotts, are not so speculative that they are unreliable. *See Care Travel Co. v. Pan Am. World Airways, Inc.,* 944 F.2d 983, 994–95 (C.A.2 (N.Y.)1991); *see also Sir Speedy Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1040 (C.A.2 (Conn.)1992). Similarly, profit margin calculations based upon documentary evidence and conversations also have a rational basis for reliance. On the issue of mitigation of damages through sales by Bayer CropScience ("BCS"), because BCS was the successor to AgrEvo EH an evaluation of BCS's sales was not inappropriate, and Dr. Martin's assumptions do not appear irrational or unreliable.

As to Dr. Martin's assumption that Scotts would have purchased GA for a duration of 10 years, any assumption as to what would have happened in a "but for" world is necessarily speculative. However, in light of the fact that Scotts had projected that it would not receive a positive return on its investment until the fifth year, assuming purchases for 10 years does not seem inordinately speculative. I am required to act as a gatekeeper in order to prevent a jury from being overwhelmed by speculation cloaked as "expertise", but I need not censor every assumption, calculation, or opinion capable of being challenged by opposing counsel. As discussed below, certain testimony may be limited at trial, but Defendants have

offered no reason to preclude Dr. Martin from testifying.

**B.** AgrEvo EH's Motion to Exclude the Expert Testimony of Dr. Janusz Ordover, Dr. Gary L. Roberts, Mr. David A. Kaplan & Mr. Martin M. Levy

**1.** Dr. Ordover

AgrEvo EH seeks to exclude the testimony of Monsanto's antitrust liability expert, Dr. Ordover, on the grounds that his testimony, as contained in his expert report and deposition testimony: is based on an inappropriate standard for assessing whether Defendants' actions were anticompetitive; usurps the role of the Court; and usurps the role of the jury. While Dr. Ordover's testimony should be limited, his testimony should not be excluded *in toto.*

In Dr. Ordover's report he writes "Monsanto's selection of Scotts was not anticompetitive if that choice made business sense irrespective of the effects on competition in general and on Finale in particular" and "the negative effect on competition is not by itself an issue, unless such adverse effect is the result of conduct that would otherwise make no legitimate business sense." (Ordover Report ¶¶ 63, 42.) Stated this way, Dr. Ordover's testimony runs counter to the applicable law and usurps my role in instructing the jury as to the appropriate legal framework for evaluating the lawfulness of the Defendants' conduct. In *United States Football League,* 842 F.2d at 1360, the Court of Appeals upheld the district court's jury instruction for determining whether Section 1 had been violated, pursuant to the rule of reason analysis, which stated that a "Rule–of–Reason case requires the fact finder to balance the

---

**14.** Having held above that AgrEvo EH has standing to assert claims on behalf of its affiliates, AgrEvo GmbH and AgrEvo USA, I need not consider Defendants' argument that Dr. Martin's damage testimony ought to be excluded for failure to disaggregate lost profits damages.

procompetitive and anticompetitive effects of any restraint." If, as Dr. Ordover states, a business decision were permissible under the Sherman Act "irrespective" of the decision's effect on competition, it is difficult to see how the required balancing of pro—and anti-competitive effects could be performed by a jury.

As to the USFL's Section 2 claim, the Court of Appeals upheld the jury instruction stating that "[a] monopolist may not, of course, use its market power, whether obtained lawfully or not, to prevent or impede competition in the relevant market." *Id.* at 1360–61. Similar to the difficulties in applying Dr. Ordover's standard to the Section 1 claims, it is hard to imagine how a jury could appropriately analyze whether Monsanto used its monopoly power to prevent or impede competition if all that Monsanto is required to demonstrate is that its actions "made business sense irrespective of the effects on competition."

A business justification of a company's actions is certainly relevant to antitrust analysis. If, for example, a monopolist engages in predatory pricing—foregoing short term profits to drive out a competitor—the fact that the decision to lower prices and forego profits does not make business sense, but for the attempt to drive out competition, is certainly relevant. Having read Dr. Ordover's report and deposition testimony, and having heard counsel's explanation at oral argument, I am convinced that Dr. Ordover does not intend his test to run counter to the appropriate tests established for Sections 1 and 2 analysis, and I am convinced that he can testify in an appropriate manner. However, Dr. Ordover's "irrespective" language, and other similar language, will inevitably confuse jurors and impinge on my ability to instruct the jury as to what standards it is required to use in evaluating the antitrust claims. At trial, Dr. Ordover must

testify in a manner that does not run counter to the established rule of reason analysis or that runs the risk of confusing the jury as to the appropriate legal tests.

Additionally, like the testimony of Defendants' other experts discussed below, some of Dr. Ordover's testimony comes very close to usurping the role of the jury, for example, in attributing subjective motivations to the parties. Such testimony is beyond the scope of expert testimony and will be precluded at trial.

### 2. Dr. Roberts, Mr. Kaplan and Mr. Levy

■ Although an expert may testify both as to questions of fact and mixed questions of fact and law, *Fiataruolo v. United States*, 8 F.3d 930, 941 (C.A.2 (Conn.)1993), AgrEvo EH contends that the testimony of Dr. Roberts, Mr. Kaplan and Mr. Levy will usurp the role of the jury. AgrEvo EH contends that each has stated in his respective report and deposition testimony conclusions that are ultimately to be found by the jury. I agree that some of the testimony, like that of Dr. Ordover in drawing conclusions about the state of mind of the Defendants, should be limited because such testimony is within the capabilities of an average juror and not a proper subject of expert testimony. To allow an expert to testify as to Defendants' subjective intentions—such as Dr. Roberts' statement in his expert report that "competition from Finale was not a factor in the development of Monsanto's business strategy or choice of potential partners" (Roberts Report ¶ 23)—creates the possibility that the jury, fully capable of reaching such a conclusion by itself, might give undue deference to the expert's conclusion. Also, such opinion is not within Dr. Roberts' expertise. Even though *Fiataruolo*, 8 F.3d at 941, recognized that an expert is not prohibited from adopting the ultimate

conclusion in his or her testimony, pursuant to Rule 704 of the Federal Rules of Evidence, and as the Advisory Committee Notes to the rules of evidence make clear, I am to guard against admission of opinions that would simply tell the jury what result to reach. Some of the proposed expert testimony goes too far and usurps the proper role of the jury.

Finding, however, that the majority of Dr. Roberts', Mr. Kaplan's, and Mr. Levy's testimony is appropriate for the jury to consider, they will not be prevented from testifying. Given counsels' agreement not to introduce the written expert reports into evidence, any limitations on the testimony can be dealt with sufficiently at trial.

Accordingly, the parties' motions to preclude each others' experts from testifying at trial are denied. The written reports of each expert shall not be introduced at trial, and the testimony of each expert shall be limited in such a manner so as not to usurp my role of instructing the jury or usurping the jury's role as fact-finder.

## CONCLUSION

For the reasons stated above, and as So Ordered in the October 25, 2004, "Memorandum and Order" (docket no. 237), it is hereby ORDERED that:

1) Defendants' motion for summary judgment for lack of standing is denied;

2) Monsanto's motion to dismiss the AgrEvo EH's affiliates' claims is denied;

3) Defendants' motion for summary judgment on the merits on AgrEvo EH's antitrust claims is denied;

4) AgrEvo EH's motion for partial summary judgment on its Section 1 claim is denied;

5) AgrEvo EH's antitrust claims shall be evaluated at trial by the jury pursuant to the rule of reason analysis;

6) Scotts' motion for summary judgment on AgrEvo EH's contract claims is denied in part and granted in part;

7) Monsanto's motion for summary judgment on the claim for tortious interference with business relations is granted and AgrEvo EH's request that its claim for tortious interference with contract be reinstated is denied;

8) Defendants' motion to preclude the expert testimony of Dr. Martin is denied;

9) AgrEvo EH's motion to exclude the expert testimony of Defendants' experts Dr. Ordover, Dr. Roberts, Mr. Kaplan and Mr. Levy is denied;

10) the written reports prepared by plaintiff's and defendants' experts shall not be submitted to the jury; and,

11) although no expert is precluded from testifying, no expert shall be permitted to testify at trial in a manner that usurps the fact-finding role of the jury, in any way instructs the jury as to the law, or invites confusion as to the applicable legal tests.

SO ORDERED.